## THE LIME ROCK.

### SAML. L. MOORE & SONS CO. *v.* THE LIME ROCK.

*(District Court, D. New Jersey.* February 24, 1892.)

1. **MARITIME LIENS—REPAIRS—AUTHORITY OF CHARTERER.**
   An owner who allows another to have full possession and management of a vessel, and thus to become the owner for the voyage, *pro hac vice*, must be presumed to consent that the vessel shall be liable for all repairs necessary to enable her to pursue the voyage, and that the special owner may bind the vessel for this purpose.
2. **SAME—ADVANCEMENTS AT OWNER'S REQUEST.**
   A third person, who, at the owner's request, pays for necessary repairs upon a vessel, is entitled to a lien for repayment.
3. **SAME—WAIVER—DELIVERY OF VESSEL.**
   A maritime lien for repairs is in the nature of a proprietary right, and is not lost by merely delivering the vessel to the owner before payment.
4. **SAME—WAIVER—EVIDENCE.**
   Repairs made upon a foreign vessel were admittedly necessary to enable her to prosecute her voyage. The owner was not a resident of the state, and in making the contract stated that he was then without funds to pay for the repairs. The vessel was to be delivered to him on completion, and he was to pay half the bill 30 days thereafter, and the remainder as the vessel earned the money. The vessel

was delivered, but no part of·the bill was paid at the expiration of the 30 days. *Held* that, although the evidence indicated that the repairs were made partly upon the credit of the owner, there was nothing to show an intention to waive the lien.

5. SAME—CONTRACT—EVIDENCE.
     Where the evidence is conflicting as to whether an oral contract to repair a vessel limited the charge to $700 or $800, the fact that the owner, on receiving a bill for $2,100, although criticising it severely, does not repudiate it, but only asks for delay of payment, will be deemed sufficient to show that no such limitation was agreed upon.

In Admiralty.    Libel by the Saml. L. Moore & Sons Company against the steam-lighter Lime Rock for repairs.   Decree for libelant.
     *Thomas F. Murtha* and *Owen, Gray & Sturges*, for libelant.
     *Henry W. Bates*, for claimant.

GREEN, District Judge.    This is an action *in rem* brought by the libelant corporation, to recover the sum of $2,148.91 for materials furnished, labor performed, and moneys laid out and expended during July and August, 1891, in repairing and equipping the steam-lighter Lime Rock. It appears from the testimony taken in the cause that the lighter was owned by Louise E. Bates; that on or about the 16th of July, 1891, Henry W. Bates, who described himself as "bailee for hire" of the lighter, and who was in fact the husband of the owner, came to the shipyard of the libelant corporation at Elizabethport, in this state, to make arrangements for the repairing and equipping of the vessel, so that she might "earn her living."    Mr. Bates was accompanied by his wife, but he did not disclose to the officers of the libelant corporation that she was the real owner.    In her presence, and with her tacit consent, he began and carried on a conversation with the officers of the libelant corporation, who were there present, which finally resulted in an agreement for the repairing and equipping of the vessel.    This agreement, unfortunately, was not reduced to writing, and the contradictory recollection of it, and the diverse constructions put upon the conversation, give rise to the real, and practically the only serious, dispute in this controversy.    As has been stated, Mr. Bates describes himself as "bailee for hire" of the vessel.    He admitted upon cross-examination that he hired and paid the crew, took charge of the running of the boat, making her contracts for carrying cargoes, and paying all the bills, including those for repairs, which might be incurred upon a voyage.

It is well settled that when a general owner allows the charterer to have the control, management, and possession of the vessel, and thus become the owner for the voyage, *pro hac vice*, he must be assumed to consent that the vessel shall be answerable for all necessary repairs and supplies to enable her to pursue her voyage, and that the special owner may lawfully bind the interest of the general owner in the vessel in this behalf.

Mr. Bates, bearing, then, this character of "owner for the voyage," caused the lighter to be brought to the libelant's yard to be repaired, in pursuance of and under the terms agreed upon in the conversation heretofore referred to.    But he insists, and in fact testifies, that there was made, at the time alluded to, a special contract, entered into with the

libelant corporation, to repair and equip the vessel for a sum not to exceed $700 or $800, of which sum, he further insists it was agreed between the parties contracting, he was to pay one-half within 30 days after the repairs had been completed, and the balance as the lighter should earn it thereafter. On the other hand the libelant corporation, by all its officers and agents, who know of the agreement at its inception, or who became acquainted with its terms as the work upon the lighter progressed, basing their knowledge upon statements and admissions of Bates, give testimony tending to show that no certain sum was named by Bates or the libelant corporation as the price of the repairs which were to be put upon the lighter, but that the real agreement entered into was this: that all such repairs should be done as were necessary, in the judgment of the officers or agents of the libelant corporation, to put the vessel in fair condition for the voyage she was about to undertake,—"to earn her living," to quote Mr. Bates' own language. The bill for the repairs, when done, amounted to $2,032.04, to which was added the amount of a bill for certain repairs put upon the vessel about the same time at the ship-yard of a Mr. Starin. amounting to $57.47, which was paid by the libelant corporation to Mr. Starin, and which repairs were made with the consent and at the request of Mr. Bates, as the bailee of the lighter in possession, or as agent for his wife, the claimant in this case. The lighter, after the completion of the repairs, was delivered into the possession of Mr. Bates. When the bill was presented, Mr. Bates refusing or neglecting to pay the one-half of it, or any part thereof, although the time for which credit was given had elapsed, this libel was fi'ed by the libelant corporation to enforce its collection.

It seems quite clear from the testimony that, at the first interview between the officers of the libelant corporation and Mr. Bates, it was the opinion of the latter that the proposed repairs, of which he had made a memorandum in writing, would not exceed the sum of $700 or $800 in his judgment; but I am equally clear that the weight of testimony shows that no such, or indeed any, limit, in cost of proposed repairs, was insisted upon by Mr. Bates as a part of the contract, or was assented to by the libelant corporation. All the witnesses for the libelant unequivocally testify that no such limit was fixed, and that no contract to repair the vessel either for $700 or $800, or any other definite sum, was entered into. The officers who so testify are the officers with whom the conversation was had in which Mr. Bates declares that such contract was made. They do not deny that Mr. Bates, who, by the way, is a counselor at law, and not a practical ship-master, did say that he thought such repairs as were necessary would cost no more than $700 or $800, but they themselves declined to give any judgment as to cost until they inspected the vessel. While, on the other hand, nowhere do the witnesses for the claimant, other than Mr. Bates himself, testify to any definite contract with the libelant corporation for the sum named. It is true that there is some testimony—chiefly that given by Mr. Bates himself—which inferentially tends to substantiate the contention of the claimant; but I think, when it is carefully scanned, it must be regarded

as very loose and indefinite, and cannot be held to overbalance the much weightier testimony offered on the part of the libelant. Besides this failure of direct evidence to sustain this claim, some minor circumstances, not denied by Mr. Bates, clearly show that no definite sum was agreed upon as the contract price of the proposed repairs. For example, when the bill of expenses had run up to quite $800, the alleged limit, and the repairs scarcely begun, the captain of the lighter, who had been left in charge of her, gave to the libelant corporation orders for equipment and repairs which its officers judged unnecessary and extraordinary. Mr. Bates was thereupon requested to come to the shipyard of the libelant, and, upon inspecting what had been done, judge for himself of the necessity and wisdom of ratifying the orders of his captain. Mr. Bates came, and, disapproving of some of the captain's orders, repudiated them; but, as to others, affirmed them, and then made a special request of the libelant that as to all other repairs thereafter to be done to the vessel, the libelant corporation should take direction from him alone. At this very time the limit of the alleged contract price had been reached. Only a small portion of the repairs which, by his memorandum, Mr. Bates had ordered to be done, had been completed, and the major part was still to be put upon the vessel. If the whole price for all the repairs was to be only $700 or $800, what difference could it possibly make to Bates if the orders of the captain were extravagant? If fairly included in the repairs or equipments that were to be made and furnished, they were already valued by the libelant corporation, according to his account, at $700 or $800; and, no matter what they cost, that sum fixed the limit of Bates' responsibility. But he does not act upon this theory. He repudiates orders of his captain, and limits the libelant corporation to the acceptance of his own orders alone, solely to limit his pecuniary responsibility. In any other view, his action cannot be understood. It is not seriously controverted that all the repairs done, and all the materials furnished, were done and furnished, not only with the knowledge and approval of Mr. Bates, but upon his direct order. He must have assumed, therefore, the pecuniary responsibility consequent upon their furnishing.

Again, when the bill for the whole amount of repairs was presented to Mr. Bates for payment, he, indeed, criticised it severely, as much larger than it ought to have been; but at no time did he repudiate it, but again and again promised to pay it as speedily as he could obtain the money, declaring at the time the bill was presented that he had no means whatever to pay it, and he could only obtain the necessary funds from the earnings of the lighter. Had the claim so presented been unrighteously and unlawfully increased by the libelant corporation from $700 to $2,100, would it be likely that Mr. Bates would have considered the question of its payment for a single moment? Would he not instantly have repudiated the account, tendered to the libelants, according to his alleged contract, one-half of $700, or $800, as covering the whole of his liability at that time, and as all the moneys which he was then bound to pay, and set his boat to earning the other half of the

contract price? Yet he does not pretend that he offered to pay or that he tendered any part of the account as presented, in cash, at the end of 30 days after the repairs were made, as he says he agreed to do originally, nor at any other time; nor did he ever tender or offer to pay the one-half of the $700 or $800 at any time, but failed and neglected or refused wholly so to do. His whole plea was for delay,—for further credit. He desired the libelants to wait for their money until the lighter should earn the amount of their bill. Can such conduct be reconciled with the contention of the claimant? Other circumstances could be referred to in justification of the conclusion that no specific sum was ever agreed upon as the price or consideration of the repairs that were to be made to the lighter by the libelant corporation, but it is not deemed necessary to refer to them in detail. I content myself with repeating that the weight of the evidence is opposed to the allegation of the claimant, that the contract price was a fixed, definite amount, and, as it seems to me, sustains clearly the allegation in this respect made by the libelant corporation.

The claimant further insists that the special contract entered into by the libelant corporation and Bates makes it clear that credit for the repairs was given to Bates personally, and that such repairs were not to constitute a lien upon the lighter, and, further, that, if they were to constitute such lien, that lien was lost by the delivery of the vessel into the possession of the claimant before it was enforced. If this were a common-law lien for repairs or for the furnishing of supplies to the vessel, the delivery of the vessel upon which they were put, to the owner, would undoubtedly destroy it. But this is not a common-law, but a maritime, lien. The Lime Rock was a foreign vessel. Her owner was not a resident of the state of New Jersey. The repairs done by the libelant corporation, admittedly, were absolutely necessary to enable her to proceed upon her contemplated voyage. It was stated by the owner *pro hac vice* that he was entirely without funds, or practically so, to pay for the repairs ordered to be made. Thus it seems that every element which goes to constitute the maritime lien was here present. Such lien is not destroyed by the loss of possession of the *res*. A lien of this character is in the nature of a proprietary right in the *res* itself, and will follow it into the hands even of an innocent purchaser without notice. The mere delivery of the lighter, therefore, to the claimant, when the repairs were completed, does not interfere in any degree with the libelant's rights, unless it can be shown that the lien was expressly waived.

As to the other matter of defense,—that the credit was given to Bates personally,—I think it may be taken as a fair deduction from the testimony that the credit was originally given partially to Mr. Bates, but I cannot conclude that the libelant corporation intended, under the circumstances, to divest itself of the right to enforce its claim by lien if the owner *pro hac vice* failed to keep his contract. It is quite true that the vessel was to be put back, by the agreement, into the possession of its owner, 30 days before any payment on account of the repairs was to be made, and after that payment the vessel was still to be left in the posses-

sion of the owner, that she might earn the balance of the debt; but it is equally a part of the contract in this case that the one-half of the bill for repairs was to be paid promptly at the end of 30 days after the completion of the repairs. Had the claimant or her owner *pro hac vice* performed that part of the contract, a different case might have been presented from that now under consideration. But it is well settled that a maritime lien is entirely consistent with a credit given for its payments, unless such lien be expressly waived. Repairs put upon a vessel under the circumstances that the repairs were put upon this vessel, raise a strong presumption that they were put there upon the credit of the vessel, and not upon the credit of the owner: and it is incumbent upon the claimant to show by weight of evidence that the lien was actually given up, in order to rebut that presumption. The burden is upon him. Not only does he fail to show such action on the part of the libelant corporation, but, when pressed for the amount of the claim due to it, he himself recognizes the right of the libelant to lien, and on that ground, to-wit, that the libelant has such lien upon the vessel for the bill, insisted that it ought to be lenient, and not press him into immediate settlement. This plea is entirely inconsistent with the theory that the libelant corporation had surrendered its lien. The true principle is that if the labor charged for has been performed, or the repairs done and the material furnished, for the vessel, no matter in what way the owner agreed to pay, if he fails to pay according to the agreement, he who furnishes the materials, or performs the labor, or completes the repairs has a right to resort to the security provided by law. I am of the opinion, therefore, that in this case the libelant corporation never intended and in fact did not divest itself of its right to lien; that right was reserved to itself in case the owner failed to comply· with the terms of his contract, and pay one-half of the cost of the repairs within 30 days after the repairs were completed. This defense cannot avail the claimant.

As to the items which go to form the amount of the Starin claim, I cannot agree with the contention of the counsel for the claimant, that they do not afford ground for a maritime lien. These repairs, as it appears from the testimony, were put upon this vessel under the supervision of Mr. Bates, and they were paid for, at his request, by the libelant corporation. They constituted a lien upon the boat before payment, and it is settled that all advances of money made to pay off claims of such a nature, upon the credit of the vessel, as these claims were, and which constitute liens in admiralty, have the benefit of the lien, with the same rank as the original claim. The item of 334 meals furnished to a portion of the crew at a hotel near Elizabethport, while the vessel was being repaired, cannot be included in this claim. Under the circumstances, they afford no basis for a lien, and must be stricken out. Let the usual decree be entered.