PRINCE v. OGDENSBURG TRANSIT CO.

(Circuit Court, D. Massachusetts. March 20, 1901.)

No. 1,139.

1. MARITIME LIENS—SUPPLIES FURNISHED IN FOREIGN PORT—CONTRACT WITH OWNER.

Where, under a contract with the owner, supplies are furnished to a vessel within the same port or state in which the contract is made, the presumption is that the dealings are not with the ship or upon her credit, but upon the personal responsibility of the owner; and no lien exists in such a case unless a credit of the ship is proved to be within the intention of the parties.[1]

2. SAME.

Petitioners, who were coal dealers having their places of business at Cleveland, Ohio, and Sandwich, Canada, entered into a contract with defendant, a corporation of another state, and having its place of business elsewhere, owning a fleet of steamers on the Great Lakes, to supply such steamers with coal during the season at the ports of Cleveland or Sandwich. The coal was furnished on orders of the masters, who gave receipts therefor, which petitioners forwarded with vouchers to the treasurer of defendant. Petitioners charged such coal on their books to the several vessels to which it was furnished, but at the end of the season took a note of defendant for the amount due under the contract. Similar contracts had been made between the parties during previous seasons, and bills had been presented to defendant's treasurer, by whom they were paid. *Held*, that the contract, presumably made at the place of performance, raised a presumption that the coal was furnished on the personal credit of defendant, and not on the credit of the ships, the fact that it was supplied in each case on the order or requisition of the master being unimportant under the circumstances, and that neither the fact that petitioners charged it to the vessels, nor that they intended to hold the vessels therefor, was sufficient to entitle them to a lien, in the absence of any provision in the contract therefor, or indicating that such was the understanding of defendant.

In Equity. In the matter of intervening petition claiming a maritime lien for supplies. On exceptions to master's report.

Goulder, Holding & Masten, for petitioners, Loftus Cuddy and Martin Mullen.

---

[1] Maritime lien for supplies and services, see note to The George Dumois, 15 C. C. A. 679.

Louis Hasbrouck, for receiver.
John Lowell, for Frederic H. Prince.

COLT, Circuit Judge. This case was heard on exceptions to the master's report. The order of reference directed the master to ascertain and report his findings of fact and conclusions of law. No exceptions were taken to the findings of fact, which are substantially as follows: The petitioners, Loftus Cuddy and Martin Mullen, both of Cleveland, Ohio, are co-partners doing business at Cleveland under the name and style of the Cuddy-Mullen Coal Company. They have also a place of business at Sandwich, in the province of Ontario, Canada. During the season of navigation of 1898, and prior to the appointment of the receiver, the defendant, the Ogdensburg Transit Company, owned and operated upon the Great Lakes, their connecting and tributary waters, the steamers Henry R. James, James R. Langdon, William J. Averell, Walter L. Frost, William A. Haskell, Governor Smith, A. McVittie, and F. H. Prince, all of them vessels of the United States duly enrolled and licensed in the collection district of Oswegatchie, in the state of New York, wherein Ogdensburg is the port of entry. The defendant is a corporation established under the laws of Michigan, having its offices at Ogdensburg and at St. Albans, in the state of Vermont; its treasurer having his office at the latter place. At various times during the season of navigation of 1898 the petitioners furnished to the respective steamers certain amounts of fuel, and there is due to the petitioners for fuel so furnished the sum of $20,230.05, with interest. All the fuel was furnished to the steamers in the port of Cleveland, Ohio, except 90 tons which were furnished at Sandwich, Ontario, for which $193.75 of the above total is due. All the fuel so furnished was furnished in pursuance of a written contract, dated May 2, 1898, by and between the petitioners and the Ogdensburg Transit Company. The contract covered the season of 1898, and was similar in its terms to a former contract between the same parties which had covered the season of 1897. There had also been similar contracts covering successive seasons between the same parties for several years before 1897. All the fuel furnished as above was furnished upon the order of the masters of the various steamers, as they coaled from time to time during the season at the petitioners' fueling docks. For the number of tons received on each occasion the master of the steamer gave a receipt to the petitioners. This receipt was then attached to a voucher and forwarded by the petitioners to the office of the transit company at St. Albans, Vt. The masters' receipts and the vouchers used were alike in form. The printed forms upon which they were made were furnished by the transit company, and used by the petitioners at the request of the transit company. On December 19, 1898, after the close of the season, the receipts appearing upon all the vouchers were filled out and signed; the petitioners having on that day taken the note of the defendant for the total amount of all the vouchers. The coal specified in the orders and vouchers above referred to was charged as furnished, to the steamer to which it was furnished, upon the dock books, sales books,

and ledger of the petitioners. From and including 1897, in the ledger, the charges to the several steamers were grouped under a common heading, viz.: "Ogdensburg Transit Company Line, Ogdensburg, N. Y.;" this being done as a matter of convenience in bookkeeping, simply. The petitioners also testified that in furnishing the coal they relied on the credit of the individual boats. No bills were ever presented for any of the coal furnished to the masters of the various steamboats, nor to any one save as above stated. For coal furnished in previous years the petitioners had presented their bills to, and received pay from, the treasurer of the transit company. The masters of the different steamers were not expected to pay, nor were they provided with funds to pay, for the coal furnished. It did not appear that the transit company had any representative or any funds at Cleveland or at Sandwich, Ontario, or that its bills for coal were ever paid by any one except its treasurer at St. Albans, Vt. No part of the money due for coal furnished having been paid, the petitioners, at the request of the treasurer of the transit company, took the note for $20,833.86, at six months, dated December 19, 1898, and thereupon signed the receipts upon all the vouchers above referred to for the amounts called for by each. The printed form whereon this note is made is one used by the petitioners in their business in cases where a lien was claimed for coal furnished. It contains the following clause: "which, when paid, shall be in full for fuel supplied the O. T. Co. steamers." This note has never been paid in whole or in part. It has never been discounted, and is tendered by the payee for cancellation in the event of a decree sustaining the liens here claimed. Section 5880 of the Revised Statutes of the State of Ohio was in force at the time of the events above referred to.

Among the conclusions of law reached by the master upon the foregoing facts, to which exceptions were filed, are the following: (1) That the coal was furnished upon the credit of the vessels; (2) that the contract does not disturb the presumption that the coal was furnished on the credit of each vessel unless it contains stipulations inconsistent with the idea that the petitioners were to have the benefit of such security; (3) that the contract does not indicate that the petitioners either relinquished or were expected to relinquish any security to which they would by operation of law be entitled; (4) that the dealings of the parties of previous years under similar contracts afford no reason for reaching a different conclusion as to its effect; (5) that maritime liens exist in favor of the petitioners against the above-mentioned steamers belonging to the defendant to the amount of $20,230.05, with interest from December 19, 1898.

The master bases his finding of maritime liens upon the following proposition: Where necessary supplies are furnished to a vessel in a foreign port upon the order of the master and in the absence of the owner, the presumption is that the supplies are furnished upon the credit of the vessel; and this presumption is not overcome by a previous contract to furnish such supplies entered into between the material men and the owners, in the absence of stipu-

lations in the contract inconsistent with the idea that credit was to be given the vessel. In support of this proposition reference is made to the early case of Peyroux v. Howard, where the supreme court, in its opinion, uses this language:

"An express contract having been entered into between the parties, under which these repairs were made, is no waiver of the lien, unless such contract contained stipulations inconsistent with the lien, and from which it may fairly be inferred that a waiver was intended, and the personal responsibility of the party only relied upon." 7 Pet. 324, 344, 8 L. Ed. 700, 708.

Peyroux v. Howard was a libel for repairs brought against the steamboat Planter, a domestic vessel in the port of New Orleans, where the material men and the owners resided. The court held that the Civil Code of Louisiana gave a lien on the vessel, notwithstanding an express contract for the repairs had been entered into between the parties. The court also decided that no lien existed under the general maritime law, that the case was governed altogether by the local law of the state, and that, if the local law gave a lien, it might be enforced in admiralty. That case is not an authority on the subject of liens under the general maritime law, and I do not find that it has ever been cited as an authority in cases relating to such liens. The general principles governing maritime liens in this country are set forth in many cases, and a reference to some of these cases becomes important in the determination of the question here raised.

In The St. Jago de Cuba, the supreme court said:

"The whole object of giving admiralty process and priority of payment to privileged creditors is to furnish wings and legs to the forfeited hull, to get back for the benefit of all concerned; that is, to complete her voyage. * * * The vessel must get on. This is the consideration that controls every other; and not only the vessel, but even the cargo, is sub modo subjected to this necessity. For these purposes, the law maritime attaches the power of pledging or subjecting the vessel to material men to the office of shipmaster, and considers the owner as vesting him with those powers by the mere act of constituting him shipmaster. The necessities of commerce require that when remote from his owner he should be able to subject his owner's property to that liability, without which, it is reasonable to suppose, he will not be able to pursue his owner's interests. But when the owner is present the reason ceases, and the contract is inferred to be with the owner himself, on his ordinary responsibility, without a view to the vessel as the fund from which compensation is to be derived." 9 Wheat. 409, 416, 417, 6 L. Ed. 122, 124.

In The Stroma, Judge Shipman, speaking for the court, said:

"It is perhaps unnecessary to say that the same presumptions by virtue of which a lien is placed upon a vessel for the payment of necessary supplies furnished to her in a foreign port upon the sole order of the master are not applicable to the case of supplies furnished in a foreign port to a vessel upon the express direction of the known general owner. In the latter case there is not, prima facie, a presumption that there was a necessity for the credit of the ship. The known general owner may, however, expressly pledge the credit of his vessel in a foreign port for supplies; and there often are circumstances and facts which show that the credit of the vessel was pledged in fact, though not in words, and that such security was within the common intent of both parties." 3 C. C. A. 530, 532, 53 Fed. 281, 283.

In The Aeronaut, Judge Brown said:

"But upon personal dealings with the general owners, or with charterers who are owners pro hac vice, for supplies to be furnished within the same

port or state where the contract is made, the legal presumption is that the dealings are not with the ship, or upon her credit, but upon the ordinary personal responsibility of the owners, with whom the dealings are had, and no lien is, in such a case, sustained, unless a credit of the ship is proved to be within the intention of both parties." (D. C.) 36 Fed. 497, 499.

In Stephenson v. The Francis, Judge Brown said:

"When a known owner, not being master, procures necessary repairs or supplies in a foreign port, the question whether a maritime lien (i. e. an implied hypothecation of the ship) arises therefor must depend upon the intention of the parties, to be gathered from all the circumstances of the transaction. This is also true, doubtless, as a general proposition, in reference to supplies procured on the order of the master. But there is an important difference in the two cases. When the supplies are ordered by the master in the absence of the owner, there is presumptively a necessity for a credit of the ship to obtain them, because in a foreign port, and in the owner's absence, the master is presumably without other means; and no implied lien is ever allowed unless there be, either in fact or by presumption of law, not only a necessity for the supplies themselves, but also a necessity for the credit of the ship to obtain them. But there is no presumption of law that an owner, because he is in a foreign port (including in that designation the different states of this country), is without means, reputation, or credit, and has no other resource but the ship to obtain needed supplies. The reason for the prima facie presumption in the case of supplies ordered by the master in a foreign port does not apply, therefore, where the owner is present and orders the supplies in person; and hence no such prima facie presumption in the latter case has ever been recognized. Maritime liens for repairs and supplies, being secret incumbrances, are not favored. They are allowed only upon grounds of commercial convenience and necessity. In the state of the owner's residence, where he is presumptively present or within easy communication, no mere maritime lien for repairs and supplies there furnished is by our law in any case allowed. In that case the presumption of law is conclusive that the owner or his representative is within reach, that he is able to supply his ship upon his ordinary responsibility, and that he intends to do so without burdening her with secret liens. In a foreign port, when the owner is present and procures the supplies in person, not being master, in the absence of any express reference to the ship as a source of credit, the same presumption as to the owner's means and as to his intention exists prima facie; but this presumption is not conclusive, as in the home port, and may be repelled by proof drawn either from the express language of the parties, or from any other circumstances satisfactorily showing that a credit of the ship was within the common intention; and when this intention appears the lien will be sustained. This is allowed because even an owner in a foreign port may be without means, reputation, or credit, and hence may be under the same necessity as the master for making use of the credit of the ship. But, as I have said, this necessity in the case of an owner is not presumed. It must appear in proof, either from the circumstances or from the terms of the negotiation, which may afford conclusive evidence both of the intent and of the necessity. It is only when the material man deals with the master, or the ship's agent, or some officer of the ship by the master's sanction or acquiescence, that he deals presumptively with the ship herself, and sells to the ship upon her credit. In other cases, the common intent to charge the ship must be shown." (D. C.) 21 Fed. 715, 719–721.

Stephenson v. The Francis is cited in the recent case of The Valencia, where the supreme court said:

"It is true that libelants delivered the coal in the belief that the vessel, whether a foreign or domestic one, or by whomsoever owned, would be responsible for the value of such coal. But such a belief is not sufficient in itself to give a maritime lien. If that belief was founded upon the supposition that the steamship company owned the vessel, no lien would exist, because in the absence of an agreement, express or implied, for a lien, a contract for supplies made directly with the owner in person is to be taken as

made 'on his ordinary responsibility, without a view to the vessel as the fund from which compensation is to be derived.' " 165 U. S. 264, 270, 271, 17 Sup. Ct. 323, 325, 41 L. Ed. 710. 713.

In the recent case of The Iris, Judge Putnam, speaking for the court, said:

"By the maritime law, no lien for supplies or labor furnished a vessel is presumed to arise on a contract made by the owner, and proof is required that the minds of the parties to the contract met on a common understanding that such a lien should be created. Neither is it sufficient that the party who furnished the labor or supplies gave credit, so far as his own intentions were concerned, to the vessel, or would not have furnished them except on the belief that he was acquiring a lien for them." 40 C. C. A. 301, 303, 100 Fed. 104, 106.

The question of maritime lien in the case at bar is governed by the rule laid down in the above cases, to the effect that where, under a contract with the owner, supplies are furnished to a vessel within the same port or state in which the contract is made, the presumption is that the dealings are not with the ship or upon her credit, but upon the personal responsibility of the owners; and no lien is sustained in such a case unless a credit of the ship is proved to be within the intention of the parties.

In the present case, Cleveland or Sandwich must be deemed the place of contract, because it was in those places, where the petitioners carried on their business, that the contract was to be performed. The contract contemplated that the masters of the defendant's vessels on their arrival at Cleveland or Sandwich would notify the petitioners of the quantity of coal required, and that this coal would then be furnished by them, and by no one else, at the price fixed by the contract. When the master in any instance notified the petitioners of the amount of coal he desired, it was presumably a notification under the contract, and the coal was presumably furnished under the contract. The situation is the same as if the manager of the defendant company had been present in Cleveland or Sandwich when the vessels arrived, and had personally notified the petitioners that he wished them to furnish under the contract the respective amounts of coal which were supplied. Where parties enter into an express contract, and proceed to act in accordance with the terms thereof, it would be laying down a strange doctrine to hold that the very transactions contemplated by the contract were outside of it or not governed by it. The fact that the master ordered the coal instead of the owner is immaterial. The contract made this circumstance merely incidental and of no importance whatsoever. The coal was not furnished upon the order of the master in the sense of the general maritime law, which contemplates the necessity for credit of the ship only when she is in a foreign port where the master is without funds and the owner without credit. No such necessity for credit can be said to arise where the material men by a previous contract with the owners have bound themselves to furnish the supplies. In my opinion, there is no presumption in this case that the coal was furnished on the credit of the vessel. On the contrary, the contract raises a prima facie presumption that the coal was furnished on the credit of the owners.

This presumption is strengthened by the fact that similar contracts had been made for the preceding season of 1897, and for several successive seasons before; that under these previous contracts the bills had been presented to the defendant and paid by its treasurer; and that the bills for the season covered by the contract in suit were presented to the defendant, and afterwards receipted upon giving a note for the amount due.

The only remaining inquiry is whether there are facts and circumstances which are sufficient to overthrow the presumption of credit to the owners by showing that it was the intention of the parties to give credit to the vessels. The proof on which the petitioners rely is not sufficient to warrant the court in finding that it was the intention of the parties to give credit to the vessels. It is of comparatively little consequence that the coal was charged to the vessels on the books of the petitioners. Nor is the circumstance that the petitioners say that they intended to give credit to the vessels, and would not have furnished the supplies without such credit, by any means controlling. The mere belief that the vessels would be responsible is not sufficient. In The Valencia, supra, it was said, "Such a belief is not sufficient in itself to give a maritime lien;" and in The Iris, supra, it was observed, "Neither is it sufficient that the party who furnishes the labor or supplies gave credit, so far as his own intentions were concerned, to the vessel, or would not have furnished them except on the belief that he was acquiring a lien for them." The petitioners refer to numerous cases where it is claimed an admiralty lien has been sustained notwithstanding a pre-existing contract. All of these may be distinguished from the case at bar. In several, the supplies, which were to have been furnished to domestic vessels in their home port by material men residing therein, were in fact furnished and delivered to the vessels in a foreign port. In other cases there are special circumstances which make them inapplicable. The Sarah J. Weed, 2 Low. 555, Fed. Cas. No. 12,350; The Comfort (D. C.) 25 Fed. 158; The Hiram R. Dixon (D. C.) 33 Fed. 297–300; The Solis (C. C.) 35 Fed. 545; The Agnes Barton (D. C.) 26 Fed. 542–544; The Lime Rock (D. C.) 49 Fed. 383, 387; The Chelmsford (D. C.) 34 Fed. 399; The Havana, 12 C. C. A. 361, 64 Fed. 496; The George Dumois, 15 C. C. A. 675, 68 Fed. 926; McRae v. Bowers Dredging Co. (C. C.) 86 Fed. 344. Exceptions sustained and petition dismissed.