THE J. R. LANGDON. THE F. R. PRINCE. THE WILLIAM A. HASKELL. THE HENRY R. JAMES. THE GOVERNOR SMITH. THE WILLIAM J. AVERILL. THE WALTER L. FROST. THE A. McVITTIE.

(District Court, N. D. Ohio, E. D. March 1, 1906.)

Nos. 2,305–2,312.

JUDGMENTS—RES JUDICATA—INTERVENERS.

Where, in a creditor's suit in a Circuit Court against a corporation vessel owner, in which defendant's vessels had been taken possession of through a receiver, claimants of maritime liens on such vessels intervened, asserting their liens and asking their adjudication and payment, and their right to such liens was tried and determined adversely to them, both by the Circuit Court and on appeal, such adjudication is conclusive, and the interveners cannot thereafter maintain a suit in rem in a court of admiralty to establish and enforce the same liens against the vessels in the hands of a purchaser under the equity decree.

In Admiralty.

Goulder, Holding & Masten, for libelants.

Roger M. Lee, for respondents.

TAYLER, District Judge. A statement of the facts, so far as they relate to the particular question now to be considered, may be briefly

made as follows: On the 15th day of May, 1899, a bill of complaint was filed in the Circuit Court of the United States for the District of Massachusetts by Frederick H. Prince against the Ogdensburg Transit Company, in the nature of a creditors' bill. This was consolidated with the case of Carlton and others against the same defendant. There were many creditors of the defendant, as well as a mortgage on its property, including several vessels engaged in transportation on the Great Lakes. In response to the prayer Percival W. Clement was appointed receiver of the defendant; and thereafter, in the course of the litigation there which concerns us here, the title of the controversy was Loftus Cuddy and Martin Mullen against Percival W. Clement, receiver, etc. On the 9th day of September, 1899, Cuddy and Mullen, the libelants in this case, intervened in the Massachusetts case, by summary petition, claiming maritime liens on the other vessels owned by the transit company covered by the mortgage. The liens claimed in that intervening petition are the same liens which the libelants seek to enforce in this action.

After setting out in detail their claim, the intervening petitioners (the libelants here) prayed as follows:

"That the receiver appointed in the above-entitled cause be directed to pay your petitioners' claims in full, as preferred liens against said steamers, or that an order be entered requiring said receiver to pay to your petitioners the earnings of said steamers over and above the cost of operating them until said several liens have been satisfied in full; and that said receiver may, in that event, be also required to insure said steamers in some good and responsible insurance companies against the perils to which said property is being subjected by such use, with loss payable to your petitioners and other holders of maritime liens as their interests may appear, and for such other and further orders as may accord with justice and petitioners' rights under the circumstances."

On the 20th day of September, 1899, the receiver filed his answer to this intervening petition, denying that the petitioners had a maritime lien against the vessels described in their petition. To the same effect the trustees of the mortgage answered. On the same day, which was 11 days after Cuddy and Mullen had intervened and become parties to the suit, a decree of foreclosure and sale was entered, which contained, among other findings, the following:

"The purchaser or his assigns shall, as part consideration for the steamboats, properties, and franchises purchased, and in addition to the sum bid therefor, take the same and receive deeds or bills of sale therefor upon the express condition that to the extent that the assets or the proceeds of assets in the hands of the said receiver, Percival W. Clement, not subject to any other lien or charge, shall be insufficient for that purpose, such purchaser, his successors, or assigns shall pay, satisfy, and discharge all indebtedness, obligations, or liabilities which shall have been contracted or incurred by the receiver before delivering possession of the property sold in the management, operation, use, or preservation thereof; and also all maritime or statutory liens upon the said steamboats or any of them which this court shall hereafter allow and order to be paid and which shall not have been paid by the receiver. * * * And the purchaser and his successors and assigns, respectively, shall thereupon be entitled to have and to hold the premises so conveyed free and discharged from the lien and incumbrance of such mortgage and of the claims of all other parties to this suit and those claiming under them, save only as herein expressly reserved, but subject to all other reservations herein contained."

145 F.—5

Thereafter the property was sold under this order for a less amount than the aggregate of the bonds against it; so that, if the contention for a lien was not sustained, nothing would be left to apply on the indebtedness to the interveners. In the decree confirming the sale, entered December 18, 1899, appear the following provisions:

"Subject, however, to all equities reserved and to all and singular the terms and conditions of purchase as provided in said decree, which terms and conditions are by reference thereto hereby incorporated in this decree with the same force and effect as though set forth at length, and subject also to the sums hereinafter required to be paid by said purchasers, Will Lawrence Sargeant and Berton Allen Aikens, and to all and singular the terms and conditions hereinafter contained. And this court expressly reserves and retains jurisdiction of this cause and power to enforce all the provisions of said decree of foreclosure and sale entered in this court, and also all provisions of this decree, including the right to retake and resell any of the property sold in case said purchasers, their successors, or assigns, shall fail to comply with any order of this court in respect to the payment of any of the prior indebtedness, obligations, or liabilities required in said decree or in respect of any other of the terms or conditions of said decree or of this decree, within thirty days after the service of a copy of such order. * * * And also all maritime or statutory liens upon said steamboats or any of them, which this court shall hereafter allow and order to be paid, and which shall not have been paid by the receiver. * * * "

On the same day an order of reference was made of the controversy arising out of the intervening petition of Cuddy and Mullen, as follows:

"And now, to wit, December 18, 1899, upon consideration thereof, it is ordered by the court that the petition of Loftus Cuddy and Martin Mullen, filed in this cause, be and the same is hereby referred to Frederic Dodge, Esq., a master of this court, to ascertain and report to the court whether or not a maritime or other lien exists against the steamers lately belonging to the Ogdensburg Transit Company. The master is not limited to finding questions of fact, but may state his conclusions of law in reference thereto."

The master thus appointed heard the proof and reported in favor of the petitioners there, the libelants here, finding that they were entitled to a maritime lien. This finding was excepted to, and on hearing before the Circuit Court was reversed (107 Fed. 978); the court holding that, under the facts as proved, the cross-petitioners were not entitled to a maritime lien for the coal supplied to the several vessels. The case was appealed to the Circuit Court of Appeals for the First Circuit, which affirmed the decision of the Circuit Court. The opinion of the court will be found in 113 Fed., at page 454, 51 C. C. A. 288. Application was made to the Supreme Court of the United States for a writ of certiorari, and was denied.

On the 12th day of July, 1901, libels were filed in this court by the same parties who had intervened in the Massachusetts case, seeking to enforce their claimed maritime lien against the vessels formerly belonging to the Ogdensburg Transit Company for supplying coal, being the same vessels upon which they sought to assert a maritime lien in the Massachusetts case. These eight cases were later, by stipulation of the parties, consolidated and heard together as one cause. Some new testimony has been taken, bearing upon the right of the libelants to have the lien on the vessels which they claim were supplied; but, in view of the conclusion to which I have arrived, that

the rights of these parties have already been adjudicated and determined, it is not necessary to refer further to this new testimony, or to any of the evidence in the case.

The respondents insist that the claim here made has already been adjudicated in the case just referred to; and it seems impossible to escape the conclusion that that position is sound. The chief grounds upon which the libelants base their claim that there has been no conclusive adjudication of their rights are that the Circuit Court for the District of Massachusetts had no jurisdiction to finally determine their rights, that their intervention in that case was necessary to protect their rights, and that their right to a maritime lien was a positive right which they might enforce in an appropriate jurisdiction, in rem; but that, the res having passed into the custody of a court of equity, no proceeding in rem could be prosecuted while the equity court had possession of the property. Some persuasive force may be conceded to this argument. For practical purposes, however, it is answered by an examination of the method in which, and the purpose for which, these libelants intervened in the equity case. They did not intervene merely for the purpose of having their rights as maritime lienholders protected. They did not merely ask for a preservation of the property, or that it be insured. They submitted the entire controversy to the court, asked a final adjudication, and sought an order directing the payment to them of the full amount of their claim.

The prayer of the intervening petition contemplated the doing of one of two different things: either (1) the payment of their "claims in full, as preferred liens" against the steamers; or (2) the payment of "the earnings of the steamers" until the liens were satisfied, and incidental to this that the steamers be insured for the benefit of the petitioners. This was a submission of the entire controversy to the court. In addition to this, they must have acquiesced in the order of sale, for they were in court, and on the same day procured an order in their own interest. That order of sale contained many provisions inconsistent with the view that the intervening petitioners could appeal to any other court if they were not satisfied with the relief obtained in that case. Similar provisions appear in the decree confirming the sale, which was entered on the day when the libelants' claim to a maritime lien was referred to the master. Now, summing this all up, we find that the libelants here did enter a court of equity voluntarily. They did set up therein their maritime lien. The court took cognizance of the claim. The other side contested. A full hearing was had. The Circuit Court and the Circuit Court of Appeals passed upon the right to a maritime lien without limitation of their power, or qualification as to the scope of the inquiry.

What question can be here litigated? Nothing but the question of a maritime lien. But that question, at the instance of the libelants, was fully tried in a court having jurisdiction of the subject-matter and of the parties, and decided on its merits. Indeed, so far as the libelants were interested in the property, it was the only question litigated. The trial was ancillary and interlocutory, as regards the main case, but it was original as regards the parties to this case. The

United States court in Massachusetts, having lawful possession of the property, had jurisdiction to sell it and dispose of the proceeds, subject, we may assume, to the rights of others who were not, or could not be, brought within the jurisdiction of that court. Subject to that assumed qualification, which concedes the libelants all they could possibly claim, the Circuit Court had unqualified jurisdiction and dominion over the subject-matter. If it had, and could acquire, no jurisdiction over the libelants against their will, that difficulty is removed by their voluntary entrance into the case and the court. If, even then, any question of jurisdiction could be raised, it could be raised only by the defendants, or by some one claiming adversely to the voluntary interveners. But no such question was ever made; and it results, therefore, that all the elements necessary to clothe a court with full jurisdiction over the parties and the subject-matter were there present. Estoppel could have no more significant or illustrative example.

It would be idle and unprofitable to endeavor to finely distinguish the various cases on the subject of res judicata as they are sought to be applied here. This case presents none of the usual difficulties where that doctrine is applied. Here were the same parties, agreeing to submit their controversy to the jurisdiction of a court which had jurisdiction of the property. The question was identical with the question here. The testimony upon it was only such testimony as would be competent here. The relief sought for was precisely the relief sought here. All of the incidents which are used to define a typical and uncomplicated case of res judicata are indisputably present. If the controversy here presented has not already been fully and finally litigated, it is difficult to conceive how an end may come to litigation.

The libels will be dismissed, at the costs of the libelants.